UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DEJUAN FRANK #642124,                                    Case No. 2:20-cv-00199

       Plaintiff,                                             Hon.   Paul L. Maloney
                                                        U.S. District Judge

  v.

TERRY MEDEN,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation (R&R) addresses the summary judgment motion filed by Defendant Dr. Meden.   (ECF No. 66.)

The Plaintiff in this case – state prisoner DeJuan Frank – filed this civil rights action pursuant to 42 U.S.C. § 1983.   He alleges in his verified complaint that Defendant psychiatrist Dr. Meden failed to provide him with treatment for his mental health issues, and, on two occasions, discontinued his medications without medical reason and in retaliation for a previous lawsuit.   (ECF No. 1.)

In the opinion of the undersigned, Frank has not provided evidence creating a genuine issue of material fact regarding his First Amendment and Eighth Amendment claims.   Dr. Meden was part of a mental health team that provided Frank with extensive mental health care and treatment.   Dr. Meden and the team provided continuous care for Frank while he was housed at the Marquette Branch

1

Prison (MBP).   While at MBP, Frank was found guilty of numerous misconduct tickets, including violations based on sexual and assaultive behavior.   Dr. Meden tried different medications to address Frank's behavioral issues.   Ultimately, although Frank had some good periods during his incarceration at MBP, Frank did not improve while on medications.

It is respectfully recommended that the Court grant Defendant Dr. Meden's motion for summary judgment and dismiss this case.

## II.  Factual Allegations

Frank says that he has suffered from serious mental health and medical issues throughout his life.   (ECF No. 1, PageID.3.)   In 2016, while in Michigan Department of Corrections (MDOC) custody, Frank was diagnosed with mood disorder, A.D.H.D. and depression.   (*Id.*)   Frank was then transferred from the Baraga Correctional Facility (AMF) to MBP so he could receive out-patient treatment.   (*Id.*)   Frank says that he began to act out violently while he waited for placement on psychotropic medications.   (*Id.*, PageID.4.)   Initially, Frank says he was told to be patient by his psychiatrist because medications were unavailable due to a contract dispute.   (*Id.*)

On May 17, 2016, Dr. Meden visited Frank and told him he would provide medication that would make him less impulsive.   (*Id.*)   Frank says that Dr. Meden prescribed Chlondine and Zyprexa, initially "floated in water."   (*Id.*, PageID.5.) But Dr. Meden told Frank that after he complied with taking the medication, he could receive it without water.   (*Id.*)

2

Frank says his behavior improved to the extent that he received a recommendation to go into the lower security level Residential Treatment Program (RTP) in Adrian, Michigan.  (*Id.*)  Frank was transferred to that program in October of 2017.  (*Id.*)  While in the program, Frank says he began experiencing difficulties with custody staff and his medication needed adjustment.  (*Id.*)  Frank says that he was transferred back to MBP after four months.  (*Id.*)

Frank explains that at this time, he had a lawsuit pending against Corrections Officer Bowerman from the Alger Correctional Facility.  (*Id.*, PageID.6.)  When Frank returned to MBP, he noticed that "a lot of officers had transferred from Alger Correctional Facility."  (*Id.*)  Frank says that the officers were constantly asking him about the lawsuit.  (*Id.*)  He also says that he noticed that his relationship with Dr. Meden changed because Dr. Meden would no longer schedule routine appointments and would cancel and delay important appointments.  (*Id.*)

Frank alleges that when he began experiencing shaking as a side effect from his medication, Dr. Meden prescribed Cogenta and told him that if that did not work, he would prescribe Artane.  (*Id.*, PageID.6-7.)  Dr. Meden asked Frank if wanted to discuss the lawsuit against CO Bowerman, but Frank declined.  (*Id.*, PageID.7.)

Frank says that he continued to experience shaking but did not see Dr. Meden for six months.  (*Id.*)  He says that he had been seeing Meden every month or two prior to this.  (*Id.*)

Frank says that on November 16, 2018, he was "placed in the hole" for fighting. (*Id.*)  Dr. Meden visited Frank at his cell on December 13, 2018.  (*Id.*)  Frank says that Dr. Meden increased his Zyprexa dosage to calm him down.  (*Id.*)

Frank says he was having trouble taking Cogenta because it was floated in water.   Frank then asked Dr. Meden if he could take it without water, but Dr. Meden refused and told him he could not do that.  (*Id.*, PageID.8.)  Frank says he asked Dr. Meden to replace Cogenta with Artane, but Dr. Meden responded: "if you have a problem with taking your Cogenta in water, then I will take you off ALL your shit!" (*Id.*)

That night, Frank did not receive any medications.  (*Id.*)  The next day, December 14, 2018, a nurse informed Frank that Dr. Meden discontinued all psychotropic medications.  (*Id.*)   Frank became irate and Psychologist and Licensed Professional Counselor (LPC) Green was called to see him.  (*Id.*, PageID.9.) LPC Green informed, Frank that his medications were discontinued after he began asking about Artane because Dr. Meden thought that Frank was being manipulative. (*Id.*, PageID.10.)   Frank told LPC Green that he was aware of the medication Artane because Dr. Meden had previously told him it was an option if Cogenta did not work. (*Id.*)  Frank says that Dr. Meden "construed the report to make it seem the reason to discontinue his medications was based on a professional judgement."  (*Id.*) Frank says the real reason that Dr. Meden discontinued his medications was because he complained about the Cogenta medication being placed in water.  (*Id.*)

Frank says he became irate and frustrated and started having suicidal thoughts. (*Id.*) Frank was placed on suicidal observation. (*Id.*) Frank informed LPC Green that he needed to stay on observation until he was placed back on his medications. (*Id.*) Frank flooded his cell and began a hunger strike. (*Id.*, PageID.11.)

Frank remained on observation from December 13, 2018, until January 1, 2019. Frank says that Chief Psychiatrist Paul Eyke[1] told him that he should not be off his medications and that he would speak to Dr. Meden. (*Id.*) LPC Green allegedly told Frank that he had spoken with Dr. Eyke and that Dr. Meden would visit Frank and place him back on his medications. (*Id.*) Dr. Meden never visited. (*Id.*)

Frank says that Dr. Eyke expressed concern that Dr. Meden had not visited Frank and stated that he would remind Dr. Meden. (*Id.*, PageID.12.) On December 27, 2018, Frank explained to LPC Green that he did not feel safe without his medications. (*Id.*) After LPC Green told Frank that Dr. Meden was coming to see him about reinstating his medications, Frank agreed that he would come off observation status but decided temporarily to remain in observation for his own safety and the safety of others. (*Id.*)

On January 2, 2019, LPC Green told Frank to use the kite system after he requested to see a doctor due to feeling uncomfortable. (*Id.*) On January 4, 2019,

---

[1]     It is unclear if Eyke is as a psychiatrist or a psychologist. Frank refers to Eyke as the Chief Psychiatrist. Defendant Dr. Meden's exhibits refer to Eyke as a supervisor. (*See e.g.*, ECF No. 66-1, PageID.509.)

LPC Green again told Frank to use the kite system after he stated he felt frustrated about his medications.  (*Id.*)   Frank says that he submitted three kites for medical care on January 5, 2019. (*Id.*, PageID.13.)   All three kites were returned, with the response: "we spoke today re: issue." (*Id.*)

Staff informed Frank on January 6, 2019, that they needed his observation cell for a suicidal inmate.  (*Id.*)   Frank says he agreed to move to a regular cell.  (*Id.*)

Frank says that on January 8, 2019, Dr. Meden walked by his cell and only came back after Frank yelled to him.  (*Id.*)   Dr. Meden told Frank that "you will be dead before I put you back on your med's."  (*Id.*)   Frank says that Dr. Meden stated, "you tried to tell me how to do my job and now I, going to make you pay" and that he had been following his lawsuit against CO Bertina [Bowerman] and they "stick together in the U.P."  (*Id.*, PageID.14.)

Frank asked to see Dr. Meden throughout January but was not scheduled to see him until January 22, 2019.  (*Id.*, PageID.15.)   Frank did not see Dr. Meden on January 22, 2019, and became frustrated.  (*Id.*)   Frank tried to give a nurse a kite to receive mental health care services and she responded that it was not her job.  (*Id.*, PageID.16.)   Frank spit in the nurse's face.  (*Id.*)   Frank says that criminal charges were brought against him by the MDOC.  (*Id.*)

On January 29, 2019, Dr. Meden reinstated Frank's medications.  (*Id.*)   Dr. Meden explained that he reviewed Frank's file and noticed that his behavior improved while he was on medication.  (*Id.*, PageID.17.)   Dr. Meden also informed Frank that if he acted out sexually, he would discontinue the medications.  (*Id.*)

Frank says when he asked why he waited to restart his medications, Dr. Meden told

him that he was waiting for Frank "to spiral out of control and start assaulting staff."

(*Id.*)

Frank says that he continued to have issues with custody staff.   On August 7,

2019, he yelled, banged his head against the wall, flooded his cell and threw unknown

liquid at officers.   (*Id.*)   Frank says he was placed in a restraint chair and almost

flipped the chair over by rocking it so much.   (*Id.*)   Frank remained in the restraint

chair for 6 to 8 hours before he was moved to another cell.   (*Id.*)   Frank says that

the officer at whom he had thrown the liquid issued him false misconduct tickets, and

told other officers not to give Frank food.   (*Id.*, PageID.19.)   Frank continued his

poor behavior and received more misconduct tickets.   (*Id.*)

Frank says that he was sexually harassed by an officer, which caused him to

try to spit on the officer.   (*Id.*, PageID.20.)   That officer continued to harass Frank.

(*Id.*)

On August 20, 2019, Dr. Meden visited Frank because of the issues that Frank

was having with custody staff.   (*Id.*)   Frank says that Dr. Meden told Frank that he

was making him look bad and that it was time to discontinue his medications to make

him suffer like the last time.   (*Id.*)   Dr. Meden stated that he would make up a valid

reason that would make it nearly impossible for Frank to get medication and that no

one  would  believe  an  inmate.   (*Id.*, PageID.22.)   Frank's  medications  were

discontinued, and he was transferred, on September 9, 2019, to Baraga Correctional

Facility (AMF).   (*Id.*)   Frank was placed in security level 5, which he says is for

housing inmates who are not mentally ill.  (*Id.*)  Frank says that at AMF, he continues to suffer with mental health issues, but his mental illness is not being taken seriously.  (*Id.*)

On November 11, 2019, Frank took his food slot hostage, went on a hunger strike, and assaulted a nurse and guard.  (*Id.*, PageID.22-23.)  Frank received seven misconduct tickets in one week.  (*Id.*, PageID.23.)  AMF staff referred Frank for mental health evaluation and treatment.  (*Id.*)  Frank asserts that the referral went to Dr. Meden, who denied the request by stating that "Marquette isn't accepting any ass holes."  (*Id.*)  Frank states that Dr. Meden continues to deny him treatment in retaliation for asserting his First Amendment rights and in violation of his Eighth Amendment rights.  (*Id.*, PageID.23-24.)

### III.  Medical Records

Dr. Meden provided 127 pages of medical records on Plaintiff Frank.[2]  (ECF No. 66-1.)  The records indicate that Frank was discharged from RTP after meeting the treatment criteria and reaching the maximum benefit of the program.  (*Id.*, PageID.441.)  The discharge summary also notes that "his deeply engrained antisocial personality traits are negatively impacting his own treatment and the treatment of others."  (*Id.*)  Frank made fair to good progress despite his "increase in sexual acting out and his involvement in other prohibited activities".  (*Id.*)  It

---

[2]    Frank has also provided the Court with a number of his medical records. (*See* ECF No. 79-1.)

was reported that Frank's problems were "behaviorally motivated" and "not the product of active [symptoms] of mental illness".  (*Id.*, PageID.442.)

In a chart update dated February 6, 2018, Nurse Practitioner Cheryl Lacy reported that Frank "knows right from wrong and is able to conform his behaviors to meet the rules of this institution should he choose.   His mental health needs cannot be met in detention."  (*Id.*, PageID.446.)

Frank was transferred to MBP on February 7, 2018.  (*Id.*, PageID.448-449.) LPC Green completed an initial treatment plan with Frank.  (*Id.*, PageID.450-454.) LPC Green wrote that Frank appears to know right from wrong and is capable of following rules.  (*Id.*, PageID.450-451.)   Frank was diagnosed with substance dependence, mood disorder, antisocial personality, and ADHD.  (*Id.*, PageID.451.)

Dr. Meden conducted a psychiatric evaluation on February 26, 2018.  (*Id.*, PageID.455-460.)   Frank acknowledged sexual deviant behavior and indicated a willingness to try to reduce or eliminate these behaviors.  (*Id.*, PageID.457.)   Frank denied side effects from his medications, requested them in solid form, but accepted that Clonidine would be dissolved in water.  (*Id.*)   Dr. Meden then modified Frank's Zyprexa prescription to allow him to receive this medication in pill form rather than crushed and dissolved.  (*Id.*, PageID.462.)

Frank saw LPC Green on March 15, 2018, and although he expressed concerns about his medications, he did not want any changes.  (*Id.*, PageID.463.)

On June 12, 2018, Frank sent a kite to report that he was experiencing side effects from his medication.  (*Id.*, PageID.465.)

Dr. Meden examined Frank on June 19, 2018.  (*Id.*, PageID.466.)  Frank stated that he was shaking uncontrollably.  (*Id.*)  Dr. Meden noted that Propanol was added on January 24, 2018, for headaches.  (*Id.*)  Dr. Meden diagnosed bilateral hand tremors and recommended reducing Clonidine and split Zyprexa dosing.  (*Id.*)

On August 10, 2018, Frank requested placement in the Secure Status Outpatient Treatment Program (SSOTP) even though he did not have a major depressive disorder.  (*Id.*, PageID.471.)  Frank reported some tremors in his hands.  (*Id.*)

On September 6, 2018, Frank reported to LPC Green that he was restless and shaking.  (*Id.*, PageID.473.)

Dr. Meden saw Frank on September 13, 2018, for a medication review.  (*Id.*, PageID.475.)  Frank was progressing in the SSOTP.  (*Id.*)  Meden noted that since February 2018, Frank had received four sexual misconducts and was involved in one fight on July 17, 2018, which was a reduction from his receipt of 22 sexual misconduct tickets (out of 52 total tickets) between October of 2017 and January of 2018.  (*Id.*)  Dr. Meden prescribed the medication Cogentin.  (*Id.*)

On December 11, 2018, Dr. Meden saw Frank and diagnosed a left-hand tremor.  (*Id.*, PageID.481-484.)  Dr. Meden suggested an increase of Cogentin, but Frank was not happy floating it in water.  Dr. Meden then decided to discontinue the medication Zyprexa prescription due to Frank's complaints of tremors, discontinue Cogentin, which is not indicated without Zyprexa, and discontinue

Clonidine "due to high toxicity in overdose or misuse" because Frank no longer wanted the medication floated in water.   Dr. Meden did note that he would consider prescribing Depakote.   Dr. Meden's note is shown below.

Assessed today.  Affect euthymic.  "I still have the shakes".  He showed coarse left hand rotational tremor through most of the session.  No other signs of abnormal movement.  I suggest increase Cogentin, and made note that it will be floated (not dissolved).  He objected to float method but could not provide rationale.  "And give me Artane instead of Cogentin.  I'll take that floated."  I pointed out his inconsistencies.  He continued to assert that he would not take any of his current meds as floated.  Since he continued to direct his treatment along irrational lines and toward substances of abuse I terminated the session.

Chart review finds quite limited response to medications or to other behavioral health treatments.
Will DC Zyprexa due to his persistent complaints of tremor, despite added Cogentin.
Will DC Cogentin due to not indicated after Zyprexa DC'd.
Will DC clonidine due to high toxicity in overdose or misuse and he refuses floated or dissolved meds.
Will coordinate with CM to monitor with trial off medications.
Consider Depakote if medication treatment becomes indicated (he's not had it before in the MDOC).

(*Id.*, PageID.481.)

On December 13, 2018, Frank broke the sprinkler head in his cell to express his displeasure with changes to his medications, specifically his unwillingness to have his medication floated in water.   (*Id.*, PageID.485.)   Frank told LPC Green that he would keep doing this, would lose control, and hurt himself or staff until he gets his medications.   (*Id.*)   Frank was placed in a suicide observation cell.   (*Id.*)

The next day Frank flooded his cell after informing LPC Green that it was unfair that he was not receiving medications and that he intended to stay in observation until he received his medications.   (*Id.*, PageID.488.)   LPC Green noted that Frank's behavior appeared motivated by secondary gain.   (*Id.*)

Frank made similar complaints on December 17 and 18, 2018.   (*Id.*, PageID.491-496.)   LPC Green noted that Frank continued his manipulative

behavior but knows right from wrong and is capable of following rules.   (*Id.*, PageID.494.)

Frank expressed his intent to go on a hunger strike to show that he was serious about getting back on his medications.   (*Id.*, PageID.497.)   LPC Green noted that although Frank showed antisocial behavior, he did not have mental health symptoms that would interfere with his ability to follow rules and regulations.   (*Id.*)

On December 23, 2018, it was reported that Frank was on a hunger strike and his last meal was December 19, 2018. (*Id.*, PageID.500.)   LPC Green visited Frank on December 26, 2018, and again noted that Frank was motivated by secondary gains. (*Id.*)   Frank had ended his hunger strike by eating, but then recently started to refuse food.   (*Id.*, PageID.501.)

On December 27, 2018, Frank requested to move out of suicide observation and indicated that he had been eating.   (*Id.*, PageID.503.)   LPC Green recommended that Frank be taken off suicide observation without restrictions.   (*Id.*, PageID.506.)

On January 1, 2019, Dr. Meden, LPC Green, and Supervisor Eyke conducted a Treatment Plan Review with Frank.   (*Id.*, PageID.508-509.)   LPC Green wrote:

**Summary of Progress to Date:** Treatment plan goals and objectives are relevant for inmate Frank in his current state. Inmate appears to be able to independently care for his daily basic needs while under the conditions of staff. Frank appears to have been able to make progress in managing his depressive symptoms as evidence by a lack of reported depressive thoughts. Franks continues to struggle with aggressive outbursts and sexually acting out as evidenced by his tickets. These last two goals are negatively influenced by Franks strong and pervasive antisocial personality traits.

**Recommendations:** Frank is recommended to continue working on goals as stated in order to progress to a lower custody level.
Next review date: 01/13/2020

**Review Team**
Reviewer #1:  Garrett Green LPC
Reviewer #2:  Paul Eyke Supervisor
Reviewer #3:  Terry Meden MD

**Patient was present at meeting.  Patient understands plan: Yes.**

**Patient's response to plan:** "This looks good."

(*Id.*, PageID.509.)

On January 1, 2019, Frank kited to speak about his medications.   LPC Green visited Frank in segregation the next day and provided him with his most recent treatment plan.   (*Id.*, PageID.510-515.)

Frank sent kites to speak with mental health staff on January 16 and 24, 2019. (*Id.*,PageID.516-517.)   LPC Green spoke with Frank both days.   (*Id.*)

On January 29, 2019, Dr. Meden visited Frank privately from the vestibule of the cell.   (*Id.*, PageID.518.)   After Dr. Meden conducted a ticket review by comparing 30 months of treatment to the previous 30 months without treatment, he noted that Frank had received 16 total tickets while being treated, and 22 total tickets while not being treated.   (*Id.*)   Dr. Meden visited to attempt to offer prescription medications to Frank.   (*Id.*)

13

Frank's cell was marked with a warning of staff assault because Frank had thrown liquid on a nurse and spit on a staff member.   (*Id.*)   Frank asked to resume his medications and Dr. Meden offered to treat Frank's mood and impulsivity with Depakote or decanoates, and Frank agreed.   (*Id.*)   Frank also asked to resume Clonidine, which Dr. Meden agreed to prescribe.   (*Id.*, PageID.518-519.)

On February 14, 2019, Daniel Holdwick, PhD., visited Frank cell-side.   (Id., PageID.525-526.)   Frank said that he was experiencing side-effects from his medications including nausea and loss of appetite, intermittent ringing in his ears and feeling shaky.   (*Id.*)   Frank believed his medications were working and he did not want to make any changes.   (*Id.*)

On February 19, 2019, Dr. Meden assessed Frank's condition privately from his cell vestibule because his door was marked with a warning that Frank had thrown liquid on staff.   (*Id.*, PageID.528-532.)   Dr. Meden believed that Depakote was the likely cause of Frank's nausea and shakiness.   (*Id.*)   Dr. Meden changed the dosage to one tablet at lunch and one at bedtime.   (*Id.*, PageID.533-536.)

On March 27, 2019, Dr. Meden reported that Frank was experiencing no psychiatric symptoms and that his medications were helpful in reducing his misconduct tickets.   (*Id.*)

On June 10, 2019, Frank met with Dr. Meden, LPC Green, and Supervisor Eyke for a treatment plan review.   (*Id.*, PageID.539-540.)   It was noted that Frank had made progress but still had "ongoing struggles to control his sexual acting out."   (*Id.*, PageID.540.)

14

On June 21, 2019, Dr. Meden, intended to discontinue Frank's psychiatric medication due to the number of sexual misconduct tickets that Frank had received since he was placed on Depakote, but he changed his mind after discussing it with Frank.   Dr. Meden explained:

Ticket review recently comparing 30 months of treatment to prior 30 months without treatment, prompting attempt to re-offer Rx, with limited, rational options:
With Treatment: 16 total tickets, 3 Fights, 12 Sexual, no assaults or threats.
Sans Treatment: 22 total, 3 Assaults on Staff, 3 Threats, 11 Sexual.
Depakote started on 1/31/19. Ten Sexual misconducts since Depakote, one assault on staff (worse).

Assessed today.  I approached with intention of stopping all psychotropics due to ineffective/worsened.
He beckoned me as I approached: "The Depakote helped me be less angry but I need something to shut this down [points to crotch].  I get bored and then I lose it.  Maybe if it just didn't work?  Do you have a medication for that?"
Given his initiative and willingness to make sacrifices to improve on sexual deviancy behavior I engaged in treatment discussion, but also revealed to him the narrow window for treatment he has.
Mood "ok". No depressive or manic sx.  Denied suicidal or aggressive ideation. No psychosis.
Depakote level 79 on 4/2/19.

(*Id.*, PageID.541.)   Dr. Meden ordered Prozac, renewed Clonidine HCl, and Depakote.   (*Id.*, PageID.543.)

On August 9, 2019, Dr. Meden noted that one of Frank's primary problems is impulsive masturbation in front of female staff.   (*Id.*, PageID.546.)   Dr. Meden diagnosed Frank with depression unspecified, intermittent explosive disorder, antisocial personality disorder, and alcohol abuse, cannabis abuse, and opiate abuse. (*Id.,* PageID.546-458.)   Dr. Meden noted that on one day, Frank received multiple misconduct tickets for threats, assaults, and other behaviors.   (*Id.*, PageID.547.) Dr. Meden increased Frank's dosage of Depakote and Prozac.   (*Id.*)

Frank sent a kite on August 9, 2019, requesting to speak with the "Chief Psych".   (*Id.*, PageID.553.)   LPC Green responded by stating that the "Acting chief psych will be informed of request."   (*Id.*)

Dr. Meden reviewed Frank's medications on August 13, 2019.  (*Id.*, PageID.554-556; ECF No. 66-2, PageID.573 (Dr. Meden's affidavit).)  Dr. Meden noted that Frank was blaming officers for giving him bogus tickets.  (*Id.*, PageID.554.)  Dr. Meden felt that Frank may be exploiting his potential transfer from MBP.  (*Id.*)  Dr. Meden planned to meet with the treatment team to discuss options including discharge of treatment with six months of monitoring or involuntary treatment.  (*Id.*)  After this assessment, Frank threatened to spit on officers, received a threat ticket, and then refused to exit the restraint chair and move into a detention cell.  (*Id.*)

On August 20, 2019, Dr. Meden noted that Frank's behavior was worse since he began medication, and that treatment has been ineffective.  (*Id.*, PageID.557; ECF No. 66-2, PageID.573 (Dr. Meden's affidavit).)  Frank continues to receive numerous sexual misconducts and other misconducts for threats, assaults, and fights.  (*Id.*)  Dr. Meden noted that the treatment team agrees that discontinuing treatment with monitoring for six months was the best course and his upcoming transfer to Baraga Correctional Facility may allow a fresh start with officers.  (*Id.*)  Dr. Meden stopped Prozac and began weaning Frank off Depakote until his prescription was discontinued.  (*Id.*, PageID.559-561.)  Dr. Meden determined that the medications were ineffective based upon his review of Frank's misconduct history.  (ECF No. 66-2, PageID.573 (Dr. Meden's affidavit.)  Dr. Meden reviewed 32 months of Frank's behavior while being treated with medication with 32 months of Frank's behavior

16

while untreated.   (*Id.*)   Dr. Meden found that Frank's behavior had worsened with medication and that the treatment was ineffective and counterproductive.   (*Id.*)

On that day, Frank was observed by custody staff with a noose around his neck. (ECF No. 79-1, PageID.1049.)   The noose was secured to the ceiling and was "cut down."   (*Id.*)   Frank did not lose consciousness.   (*Id.*)

On August 21, 2019, LPC Green conducted a suicide risk evaluation of Frank. (ECF No. 79-1, PageID.1049.)   LPC Green wrote:

> Inmate appears able to independently care for his daily basic needs while under the conditions of staff. Inmate was able to track the conversation and presents with no significant abnormal motor functions. Inmate presents with some evidence of suicidal risk or thoughts of hurting others. Inmate was in no acute stress and mental health services will follow per policy. He appears to know right from wrong. He is capable of following departmental rules and expectations.
>
> Management plan completed and distributed.

(*Id.*, PageID.1050.)   Frank indicated that he was not feeling suicidal but "felt suicidal last night."   (*Id.*, PageID.1051.)

On August 26, 2019, LPC Green visited Frank.   (ECF No. 66-1, PageID.562-564.)   Frank complained that he was agitated at night, and he needs his medications to help him sleep.   (*Id.*, PageID.562.)   LPC Green noted that Frank might use maladaptive behaviors to try to get his medications.   (*Id.*)

Frank was transferred to Baraga Correctional Facility on September 6, 2019. (*Id.*, PageID.565-566.)   Frank argues that he should not have been transferred to Baraga Correctional Facility and that Dr. Meden should have continued to treat him for mental health issues.

## IV.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## V.  Eighth Amendment

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as the failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately

indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*  "[A]n inmate who complains that ***delay in medical treatment*** rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."  *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted).  The Court of Appeals elaborated on the holding in *Napier* in its 2004 ruling in *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's ***failure to treat a condition adequately***, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added).  Thus, *Napier* and *Blackmore* provide a framework for assessing a claim of delayed or inadequate care for a non-obvious condition:  A plaintiff making this type of claim must place verifying medical evidence in the record to show the detrimental effect of the delayed or inadequate treatment.

However, the objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Id.* at 899.

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834).   Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*   Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.   The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018).   The court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.   Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness."   This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.
>
> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailer, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm."

*Id.* at 738–39 (6th Cir. 2018) (internal citations omitted).

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

[A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996).

This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering.   *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."   *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).   If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell* 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).   He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

22

### A. Objective Prong

The records outlined above indicate that Frank was incarcerated at MBP in 2016 and 2017, and then again from February 2018 through September 2019. During that time, he received care from a number of caregivers, including Dr. Meden. These records portray what were essentially exceedingly difficult and contentious periods of treatment.   Frank's caregivers pursued a number of different approaches to his treatment.   In broad terms, brief periods of progress were quickly lost as Frank regressed, engaged in sexually inappropriate behavior, went on hunger strike, damaged cells, assaulted others, threatened suicide or simply decided to protest the fact that Dr. Meden ordered medications to be delivered to Frank in water.

The records before the Court demonstrate that Frank was a difficult prisoner with numerous issues.   But the records fail to indicate what course of treatment was appropriate, that Dr. Meden delayed treatment, or that any delay harmed Frank. As Dr. Meden pointed out, Frank's behavior was not better while he was being treated with medication.   (ECF No. 66-1, PageID.554-556; ECF No. 66-2, PageID.573.) Frank still received numerous misconduct tickets for exposing himself, threatening staff, assaulting staff, and fighting.   (*Id.*)   Dr. Meden eventually determined that Frank's behavior was worse while he was being treated.   (*Id.*)   In addition, Frank's caregivers regularly noted that he "knows right from wrong and is able to conform his behaviors to meet the rules of this institution should he choose."   (Id., PageID.446.)

Frank asserts that he had serious medical issues.   And the record clearly

indicates that he faced challenges in dealing with those issues.   That part of the case is not in dispute.   But obvious medical needs usually have obvious solutions.   This case presents the opposite situation:   seemingly obvious issues but no obvious course of treatment.   As a result, the record before the Court paints a muddled picture of what treatment Frank's actual issues and needs were when he was under Dr. Meden's care.   In his response to Dr. Meden's motion for summary judgment, Frank includes a variety of MDOC records and his own affidavit.   (ECF Nos. 79-1, 79-2.)   But Frank (1) fails to establish what the *correct course of treatment was*, (2) fails to establish that Dr. Meden delayed the delivery of this course or treatment, and (3) fails to place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.

In the opinion of the undersigned, Frank has failed to establish that he has a serious medical need for treatment as required to create a genuine issue of fact with respect to the objective prong of his deliberate indifference claim.

## B. Subjective Prong

Essentially, Frank is arguing that Dr. Meden should have made different treatment choices.   Dr. Meden stopped Frank's medications on two occasions. During a medication review on December 11, 2018, Dr. Meden suggested an increase of Cogentin floated in water, based upon Frank's left hand rotational tremor.   (ECF No. 66-2, PageID.569.)   Frank objected to floating any medication in water, except for Artane.   (*Id.*)   Dr. Meden told Frank that it was inconsistent of him to not want any medications except for Artane floated in water.   (*Id.*)   Dr. Meden attests that

Frank's hand tremor did not indicate treatment with Artane, which is indicated only in extreme cases of abnormal muscle movement.   (*Id.*, PageID.574.)   Dr. Meden states that Artane is the most abused mental health medication in the prison system. (*Id.*)   Frank's statement that he did not want any medications floated, except for Artane, was a red flag for Dr. Meden.   (*Id.*)   Dr. Meden discontinued Zyprexa because of Frank's tremors.   (*Id.*, PageID.569.)   Cogentin was discontinued because it was no longer indicated after Zyprexa was discontinued.   (*Id.*)   Dr. Frank discontinued Clonidine due to a high toxicity in overdose or misuse, and because Frank refused to have his medication floated or dissolved.   (*Id.*)   Dr. Meden further noted that he would consider prescribing Frank Depakote.   (*Id.*)   Ultimately, Dr. Meden found that Frank was attempting "to direct his own treatment along irrational lines and abusive substances."   (*Id.*)

On January 29, 2019, Depakote was prescribed to Frank to treat mood lability and impulsivity.   (*Id.*, PageID.570.)   Dr. Meden also prescribed Clonidine HCL floated in water.   (*Id.*)

On June 21, 2019, Dr. Meden reviewed Frank's medications and intended to stop all medications because Frank exhibited worsening behavior *while on medication.*   (*Id.*)   Frank had received ten sexual misconduct tickets and one assault on staff misconduct ticket.   (*Id.*)   Frank indicated that he would improve his sexual deviant behavior and Dr. Meden agreed to continue his medications and to add Prozac but warned Frank that there was a narrow window for treatment given his recent behavior.   (*Id.*)

Frank's behavior unfortunately did not improve.   Dr. Meden conducted a misconduct ticket review and determined that while taking medication, Frank's receipt of misconduct tickets had worsened and that treatment and medication were not effective but were having counterproductive effects.   (*Id.*)   Dr. Meden met with Frank's treatment team, and it was agreed that medication should be discontinued for a six-month period and Frank should be transferred to a different facility to give him a fresh start with custody staff.   (*Id.*)

In the opinion of the undersigned, Frank disagrees with the medical care and treatment that he received.   Dr. Meden and LPC Green provided Frank with regular mental health treatment and evaluation.   Frank's assertions that he was denied care and treatment is clearly contradicted by the medical record.

Dr. Meden first stopped Frank's medication after Frank disagreed with the requirement to float his medication.   Floating medication in water is done to prevent abuse.   Frank refused to accept his medication floated but indicated that he would only accept Artane floated – a commonly abused medication in the prison and one that was not indicated for Frank's condition.   (ECF No. 66-1, PageID.481-484.)   Dr. Meden was concerned that Frank would only accept Artane floated and that he would not accept other medications floated.   Dr. Meden was not willing to provide Frank with Clonidine and Zyprexa in tablet form rather than floated in water, so he discontinued it.   And, as noted above, without Zyprexa, there was no need for Frank to take Cogentin.

Finally, Dr. Meden discontinued Frank's medications after he determined that the medication was counterproductive and causing Frank to behave worse than when he did not receive the medications.   Dr. Meden with Frank's treatment team determined that discontinuing Frank's medication for a six-month period under observation and transferring him to a different facility so he could get a fresh start with custody staff was in Frank's best mental health interests.   In the opinion of the undersigned, Frank has failed to establish that Dr. Meden's diagnosis of his mental health condition and treatment decisions were deliberately indifferent to his medical needs.

Frank made unsubstantiated conclusory assertions in his complaint to support his claim that Dr. Meden acted with deliberate indifference.   Frank says that Dr. Meden falsified the records to make it look medically necessary to discontinue the medications, and on one occasion stated you will be dead before I put you back on medication.   (ECF No. 1, PageID.10, 13, 22.) Where "the parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).   Frank has failed to support his self-serving statements or rebut the contrary evidence submitted that establishes that Dr. Meden and his team made a medical decision to discontinue medications.   As Dr. Meden established, Frank committed numerous misconducts involving improper sexual behavior, assaults and fighting regardless of whether he was being treated with medication.   Dr. Meden also

determined that Frank's pattern of receiving misconducts worsened while he was taking medication.

Frank has failed to present evidence indicating that his conflict with Dr. Meden was anything other than a disagreement over the course of treatment to pursue. Accordingly, the undersigned finds that the record fails to indicate a genuine issue of material fact with regard to the subjective component of Frank's deliberate indifference claim.

## VI.  Retaliation

Frank argues that Dr. Meden's actions in allegedly failing to provide him care and treatment were based upon a lawsuit that Frank had filed in 2016 in this Court against a Corrections Officer from Alger Correctional Facility – *Frank v. Bowerman*, W.D. Mich. Case No. 2:16-cv-154[3] – which was still pending as of October of 2017. (ECF No. 1, PageID.5-6.)  Dr. Meden asserts that he had no knowledge of that lawsuit, and that he was not motivated by a lawsuit that Frank had filed before Dr. Meden began treating Frank.

---

[3]    The Defendant failed to appear and defend that lawsuit.   Default was entered, and, on December 19, 2018, Default Judgment was awarded to Frank.  (*Frank v. Bowerman*, W.D. Mich. Case No. 2:16-cv-154, ECF No. 30.)   Frank was represented by counsel and was awarded $100,000 in compensatory damages, $100,000 in punitive damages, attorney fees in the amount of $9,537, and costs of $487.61.   (*Id.*) In that lawsuit, Frank alleged that he was psychologically tortured by CO Bowerman. Frank alleged in his complaint that Dr. Meden asked him about the lawsuit. Although, Dr. Meden asserts that he was unaware of the lawsuit, it would make logical sense for him to discuss the underlaying allegations in that lawsuit as part of his treatment of Frank.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.    *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).    In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.    *Id.*

After a prisoner establishes the first two elements, the prisoner must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The Sixth Circuit has also employed a burden-shifting approach with respect to the causation element:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Thaddeus-X,* 175 F.3d at 399.

As Dr. Meden concedes a prior lawsuit qualifies as protected conduct.    (ECF No. 66, PageId.436.)    Dr. Meden argues that Frank has failed to establish adverse action or a causal connection between Dr. Meden's decisions regarding Frank's medical treatment and his previous lawsuit against Alger Corrections Facility CO

29

Bowerman.    Frank only sets forth a conclusory argument that Dr. Meden retaliated against him after Frank returned to MBP from RTP in February of 2018.    It is undisputed that Frank had problems with custody staff at Adrian Correctional Facility while he was in RTP, and that this was the reason for his transfer back to MBP.    It is also undisputed that Frank did not improve his behavior after RTP and his return to MBP.

Dr. Meden continued to treat Frank and Frank continued to have regular mental health care visits at MBP until his transfer to AMF in September of 2019. As addressed above, Frank disagrees with his course of treatment.    Frank has failed to show that Dr. Meden took adverse action against him and even assuming that Dr. Meden was aware of the lawsuit, Frank has failed to show a causal connection between the lawsuit and the treatment decisions made by Dr. Meden.

Frank received extensive care and treatment while at MBP, not only from Dr. Meden, but also from LPC Green, Supervisor Eyke, and other staff.    The treatment decisions that Dr. Meden made, particularly in discontinuing his medications on December 11, 2018, were in response to Frank no longer wanting his medications floated in water and because he had requested the highly abused medication Artane (which he said he would have taken floated).    Finally, Dr. Meden's decision to discontinue Frank's medications in August of 2019, was based upon the failure of his long-term treatment plan.    Dr. Meden had tried several different medications and combinations of medications, but nothing worked.    He determined that Frank exhibited worse behavior while on medications.    Dr. Meden made a decision to take

Frank off medications for a six-month trial period.   Frank has not shown that Dr. Meden's treatment decisions were retaliatory.

In the opinion of the undersigned, Frank has failed to establish that adverse conduct was taken or that a causal connection existed between Dr. Meden's treatment decisions and Frank's previous lawsuit.

## VII.   Recommendation

It is respectfully recommended that the Court grant Defendant Dr. Meden's motion for summary judgment and dismiss this case.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:    August 2, 2022                          /s/ *Maarten Vermaat*
                                                  MAARTEN VERMAAT
                                                  U.S. MAGISTRATE JUDGE